IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FINAL EXPENSE DIRECT,        §
       §
       Plaintiff,        §
       §
vs.        §
       §     CIVIL ACTION NO. _____
PYTHON LEADS, LLC, JACQUELYN        §
LEAH LEVIN, AND DAVID LEVIN,        §
       §
       Defendants.        §

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Final Expense Direct, by and through its undersigned counsel, files this Complaint against Python Leads, LLC, Jacquelyn Leah Levin, and David Levin (collectively, "Defendants"), and in support thereof, states as follows:

## PARTIES

1.     Plaintiff, Final Expense Direct ("Plaintiff" or "Final Expense"), is a sole proprietorship organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas.

2.     Defendant, Python Leads, LLC ("Python"), is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Sarasota, Florida at 5533 Marquesas Circle, Sarasota, Florida 34233.  Python can be served through its registered agent for service Jacquelyn Leah Levin, 105 22nd Street West, Bradenton, Florida 34205.

3.     Jacquelyn Leah Levin ("Ms. Levin") is an individual and a resident of Florida and may be served at 105 22nd Street West, Bradenton, Florida 34205.

4.     David Levin ("Mr. Levin") is an individual and a resident of Florida and may be

1

served at 105 22nd Street West, Bradenton, Florida 34205.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as the Parties are citizens of different states and the amount in controversy exceeds $75,000.00.

6.      This Court has personal jurisdiction over Defendants because they purposely availed themselves of the benefits and protections of the State of Texas by establishing minimum contacts with the state.  *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011). Specifically, Defendants knew Plaintiff's principal place of business is Houston, Texas when they contracted with Plaintiff to provide live transfer services.  (*See* **Exhibit A**, Final Expense Live Transfers Contract).   In accordance with this contract, Python agreed to generate leads for Plaintiff's life insurance business.

7.      Moreover, both Mr. and Mrs. Levin have accepted payment for Python expenses to their personal bank accounts.  Upon execution of the contract, Defendants requested and accepted payment for services from Plaintiff to Ms. Levin's personal, rather than corporate, checking account.  (*See* **Exhibit B**, e-mail from Ali Raza to Ellen Jo Wilhelm and Luis Beauchamp,[1] dated March 31, 2021).  Upon information and belief, Ms. Levin jointly shares this account with Mr. Levin, her husband.  Defendants repeatedly requested payment to the Levins' personal account and ensured Ms. Levin completed a W-9 to document same.  (**Exhibit B**; *see also* **Exhibit C**, Ms. Levin's Form W-9, Request for Taxpayer Identification).

8.      In discussions concerning payment, Ms. Levin made clear she understood that Final Expense is located in Texas, and that she expected to continue doing business with and accepting payment from same. (**Exhibit D**, e-mail from Ms. Levin to Final Expense, dated December 6,

---

[1]      Ellen Jo Wilhelm ("Ms. Wilhelm") is co-owner of Final Expense, and Luis Beauchamp ("Mr. Beauchamp") is Final Expense's Vice President of Marketing.

2

2021, discussing Texas and noting that Python's ability to indemnify its clients was based on Ms. Levin's personal legal team servicing all fifty (50) states)).  Upon information and belief, Final Expense  was also instructed to remit payment to Mr. Levin personally, rather than the Python corporate account for sums alleged to be owed during the course of the parties' relationship.  As explained in detail in the Factual Background below, the Levins pierced the corporate veil by directing that payment for a corporate contract be made to a personal account.  Ultimately, Defendants conducted themselves in a manner consistent with having reasonably anticipated that they would be hailed to court in Texas.

9.      This action arises under the laws of the State of Texas, as Defendants intended and directed their misconduct, and the conduct they encouraged, to adversely affect a resident of Texas, making Texas law applicable.  This action arises under the laws of the State of Texas because several of the events that form the bases of this suit occurred in Texas and because it is clear from Defendants' conduct that it was their goal to target Plaintiff in Houston, Texas.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

11.      Final Expense is a small business engaging in life insurance sales.  Final Expense is organized as a sole proprietorship.

12.      Python is a lead generation company for Medicare and final expense[2] individuals.

13.      On March 15, 2021, Final Expense and Python entered into an agreement whereby

---

[2]      While Final Expense (stylized with the capitalization) refers to Plaintiff in this case, final expense insurance policies reference permanent life insurance policies intended to help older adults cover funeral costs and end-of-life expenses.

Python was to generate leads for Final Expense ("Agreement"). (**Exhibit A**).[3]  At all times relevant to this action, the Parties acted in accordance with the terms of this Agreement.  Final Expense has only ever worked with Python under the terms of the Agreement; the Parties never entered into any other contractual relationship.

14.     In accordance with rules promulgated by the Telephone Consumer Protection Act of 1991 ("TCPA") and federal and state do not call registry lists ("DNC lists"), Python initiated phone calls to prospective insurance purchasers.  (**Exhibit A, ¶¶** 1, 4).  At the point where the lead became viable, Python then transferred the caller to a Final Expense sales agent who completed the transaction.  At all times, Python, under Ms. Levin's authority, was the sole entity that engaged with call lists and initiated cold calls; as part of its business model, Final Expense does not engage in any outbound dialing.  As such, the Agreement made clear that responsibility for compliance with the TCPA and DNC lists remained, at all times, with Python and Ms. Levin. (*See* **Exhibit A**, ¶ 4, "It is the sole responsibility of [Ms. Levin and Python] to familiarize with all laws and regulations applicable with TCPA, FEDERAL AND STATE DO NOT CALL REGISTRY!") (emphasis in original).[4]  Such indemnity provisions are standard in the insurance industry.

---

[3]     Final Expense does not have a copy of the Agreement that is signed by both parties, though one may exist upon information and belief; while the fact that a party has signed a contract creates a "strong presumption" that the party has assented to the terms of same, the absence of a party's signature does not destroy an otherwise valid contract and is not dispositive of the question of whether the parties intended to be bound by it.  *Wright v. Hernandez*, 469 S.W.3d 744, 756-57 (Tex. App.—El Paso, 2015).  Texas Courts have recognized that an unsigned agreement may be enforceable if the agreement itself does not specify that it requires a party's signature.  *Id.* at 757; *accord In re AdvancePCS Health L.P.*, 172 S.W.3d 609 (Tex. 2005) (concluding that signature requirements were only applicable in certain circumstances).  Moreover, Python invoicing Final Expense under the terms of the Agreement indicates acceptance of the terms of the Agreement and intent to act pursuant to its terms.  Additionally, as set forth in Paragraphs 20–21 of this Complaint, Python and Ms. Levin continuously and expressly affirmed their responsibilities under the Agreement.

[4]     Throughout the agreement, Ms. Levin and Python were jointly named as "Party A" and Final Expense Direct was named as "Party B" for purposes of identifying parties to the contract, responsibilities of each, and payment processes.  (**Exhibit A**).  However, the Parties' names were switched in the Agreement's signature block, though this error is harmless and does not detract from the full reading of the Agreement.  *See Grand Acadian, Inc. v. Fluor Corp.*, No. 2:07 CV 295, 2009 WL 1650076, at *4 (W.D. La. June 11, 2009) (discussing evidence demonstrating mutual clerical mistakes in spelling and naming division throughout a contract).

15.     As the bearer of this responsibility, Ms. Levin and Python also agreed to indemnify Final Expense from any claims arising from Python's breach.  (**Exhibit A**, ¶ 4).  In relevant part, the Agreement provided that: "[Ms. Levin and Python] will hold [Final Expense] harmless from and against any and all claims, costs, actions, losses, expenses, liabilities, and damages ("Claims") arising from the Undersigned's breach of the Agreement or this Addendum or failure to ensure that the Leads provided to your company comply with the terms of the TCPA." (*Id.*).  Such language is standard in all of Final Expense's vendor contracts.  Because it does not contact end-users, it requires a vendor—here, Python—to indemnify it from all claims flowing from the vendor's breach.

16.     The Agreement also outlined payment terms, by which Python billed for any leads that were transferred and remained engaged with Final Expense for at least five (5) minutes. (**Exhibit A**, ¶ 3).  Python billed at various rates based on when the leads were generated: $55.00 per lead in the first week; $65.00 per lead in the second week; and $75.00 per lead in the third week.  (*Id.*).

17.     Python's subsequent invoicing was consistent with this pricing scheme.  On March 29, 2021, Python issued Invoice No. 57 to Final Expense, totaling $1,760.00 for thirty-two (32) leads billed at $55.00 each.  (**Exhibit E**, Invoice No. 57).  The following week, Python issued Invoice No. 59 to Final Expense, totaling $2,145.00 for thirty-three (33) leads billed at $65.00 each.  (**Exhibit F**, Invoice No. 59).  One (1) week later, Python issued Invoice No. 3 to Final Expense, totaling $1,425.00 for nineteen (19) leads billed at $75.00 each.  (**Exhibit G**, Invoice No. 3).

18.     On March 31, 2021, Final Expense attempted to pay Invoice No. 57 by depositing

funds into a Wells Fargo checking account ending in digits 7909, as directed by the terms of the Agreement. (*See* **Exhibit A**, ¶ 7). However, Wells Fargo rejected the payment. (**Exhibit B**, e-mail from Ms. Wilhelm to Ali Raza, dated March 31, 2021). In subsequent correspondence with Python, Final Expense learned that this account was not a Python corporate account, but instead, was Ms. Levin's personal checking account. (**Exhibit B**, e-mail from Ali Raza to Ms. Wilhelm, dated March 31, 2021). As part of the e-mail exchange, Python confirmed it did not yet have a corporate account. (**Exhibit B**, e-mail from Ms. Wilhelm to Ali Raza, dated March 31, 2021: "You have funds going directly to Jacquelyn in a personal account. Does Python not have a corporate account?"; *Id.*, e-mail from Ali Raza to Ms. Wilhelm, dated March 31, 2021: "No we do not have yet- It is her personal account"). On information and belief, the Wells Fargo checking account ending in digits 7909 is co-owned by Ms. Levin and her husband, Mr. Levin. To properly document for tax purposes that payment was being made to a personal account, Final Expense requested that Ms. Levin complete a W-9, attached hereto as **Exhibit C**. Final Expense made subsequent payments to satisfy Invoice No. 59 (week two) and Invoice No. 3 (week three) to Python's newly created corporate account.

19.     At all times relevant to this action, the Parties acted in accordance with the terms of this Agreement. Defendants billed for live transfer leads at rates established by the Agreement until December 2021, when Python, through Ms. Levin, discounted Final Expense's bill-rate to $27.00. (**Exhibit D**, "We are planning to have a LONG and Prosperous relationship with you and wanted to show how much we appreciate you by lowering the lead cost.") (emphasis in original). Moreover, Defendants knew their indemnity obligations, went to lengths to explain the basis of same to Final Expense, and acted consistently with them by insisting that Final Expense immediately refer any complaints to Python, rather than attempt to handle same internally. (*Id.*,

"We [Python] are able to protect our clients because I, [Ms. Levin] (owner) am local in the US and I have a legal team that provides me services in all 50 states.")

20.     From the outset of the contract, the relationship between Final Expense and Defendants has been tenuous, at best.  Nonetheless, Final Expense always upheld its obligations under the contract.  For a short time, Python and Ms. Levin appeared as though they would as well. Per the indemnity terms of the Agreement, Ms. Levin directed any complaints received by Final Expense to be forwarded to Python for processing.  Accordingly, if Final Expense received a complaint from an individual who believed they were illegally contacted, in violation of the TCPA or DNC lists, Final Expense would forward the complaint to Python and Ms. Levin.  (*See, e.g.*, **Exhibit H**, e-mail from Ms. Levin to Mr. Beauchamp, dated August 21, 2021).  Shortly after Python began generating leads for Final Expense, the complaints began.

21.     For example, in August 2021, three (3) separate individuals contacted Final Expense complaining that they had been improperly contacted by Final Expense, in violation of DNC lists.  (*See* **Exhibit I**, e-mail from Python to Mr. Beauchamp, dated August 2, 2021, "sure don't worry" and "If he approaches again please let me know will handle that our end- so he will not bother you again;" **Exhibit J**, e-mail from Python to Mr. Beauchamp, dated August 19, 2021, "We are scrubbing our data against TCPA and DNC litigator list…you guys are completely harmless"; **Exhibit H**, Ms. Levin confirming she will reach out to the complainant).  Upon receipt of each complaint, Final Expense relayed the information to Python, as Python—in accordance with the terms of the Agreement—was required to maintain compliance with DNC lists and handle all complaints related to same.  On each occasion, Python assured Final Expense that it was cognizant of its obligations under the Agreement and would respond to each complaint.  (*See* **Exhibit A**; **Exhibit H**; **Exhibit I**; **Exhibit J**).

22.     Likewise, in December 2021, Jayana Eppler ("Ms. Eppler") contacted Final Expense, alleging she was contacted in violation of the TCPA; as stated above, the violative contact was initiated by Python.  (**Exhibit K**, correspondence from Ms. Eppler to Final Expense).  In accordance with the terms of the Agreement, Final Expense directed Ms. Eppler to contact Python regarding her claim.  (**Exhibit K**, e-mail from Sarah Premeaux to Ms. Eppler, dated January 21, 2022).  When Python initially refused to answer Ms. Eppler, Ms. Wilhelm intervened via e-mail to Ms. Levin.  (**Exhibit K**, e-mail from Ms. Wilhelm to Ms. Levin, dated January 31, 2022).  Therein, Ms. Wilhelm reminded Ms. Levin that Final Expense is indemnified by Python and reminded her of the process to which both parties had agreed:  "When these types of complaints come in, we [Final Expense] send them to our vendors and they are settled that day or within a couple of days. It's been nothing but a struggle for us [Final Expense] with your office [Python]."  (*Id.*).  Ms. Wilhelm went on to remind Ms. Levin of the direction Ms. Levin had personally provided:

> "You [Ms. Levin] stated that you would take care of this and you haven't. You stated Jayana Eppler needed to reach out to your office, which she has, and you would handle it. You and/or your legal [team] have not. The fact that you are having her contact you is utterly unprofessional and ridiculous. Your office is doing nothing but let this drag on in the hopes she will go away. Clearly, she has not. Get this settled now!"

(*Id.*).  Ms. Levin promptly responded, confirming what both parties knew: Final Expense was to be indemnified by Python, and it was Python's responsibility to handle all claims.  (**Exhibit K**, e-mail from Ms. Levin to Ms. Wilhelm, dated January 31, 2022).  Ms. Levin acknowledged that it was Python who was to handle all claims ("it is imperative you let us handle these consumers and you do not engage with them"), and that Python would be first to respond ("If this ever happen again, please do your best not to engage and call me or text me immediately.") (**Exhibit K**).  Ms. Levin made clear that Defendants were well aware of their contractual obligations: "**We will**

8

**always take responsibility in protecting you** [Final Expense]." (**Exhibit K**).

23.     As additional claims came in, Python upheld its obligations by responding to and resolving the complaints.  (*See* **Exhibit L**, e-mail from Ms. Levin to Ms. Wilhelm, dated March 11, 2022, "we will… get this resolved for you").  In many cases, Python settled the complaint by paying the complainant $1,500.00, advising Final Expense of the outcome, and then releasing all parties, including Final Expense, from liability.  On at least one (1) occasion, Defendants directed Final Expense to reimburse settlement to Mr. Levin's personal account, rather than a Python corporate account.  (**Exhibit D**).  Defendants confirmed that Mr. Levin personally received the funds when asking Final Expense to sign a nondisclosure concerning the settlement.  (*Id.*).

24.     Throughout its professional relationship with Final Expense, Python periodically attempted to propose new opportunities and encouraged that the Parties enter into additional contractual relationships.  For example, in May 2021, two (2) months after signing the Agreement at issue here, Python proposed assisting Final Expense in creating its own facility for call leads. (**Exhibit M**, e-mail from Python to Mr. Beauchamp, dated May 18, 2021).  Python offered to provide Final Expense with a business model and facility to open a Pakistan-based call center, in return for ten percent (10%) of its annual premium.  (*Id.*).  Python reasoned that its offer was mutually beneficial, enabling Python to grow in the industry (noting that Ms. Levin, "was smart enough to create her own call center so she doesn't have to rely on anyone for her leads . . . ") while charging Final Expense less per lead (comparing the new offer to the terms of the existing Agreement, under which Ms. Levin "is getting 20% charge back.").  (*Id.*).  This proposal was far beyond the scope of anything Final Expense was interested in, so it promptly declined the offer.

25.     In June 2022, while the original Agreement was still being performed, Python proposed a third partnership opportunity to Final Expense.  Python's newest proposal seemed more

reasonable to Final Expense: Python would continue providing similar lead-transfer services as existed under the original Agreement but would charge a flat $20.00 per-transfer fee, with a three (3) minute buffer.  (**Exhibit N,** e-mail from Mr. Beauchamp to Python, dated June 28, 2022).  After Python proposed these terms, the Parties began negotiating a potential second contract.  (*Id.*). Specifically, Python's proposed transfer criteria required Final Expense to update its computer and software capabilities, which, in turn, required Final Expense to consult with its third-party information technology ("IT") team.  The consultations ultimately became stagnant, so Final Expense never agreed to nor acted upon Python's proposed terms. Though Python jumped to execute a draft version of the contract—which had not yet been finalized—same never came to fruition because the Parties never agreed to its terms.  (*Compare* **Exhibit O**, draft Python Leads Agreement, signed by Ms. Levin on June 25, 2021, with **Exhibit N**, e-mail from Mr. Beauchamp to Python documenting ongoing negotiations as of June 28, 2021).  To date, the draft agreement has never become operational.  The Parties have never performed work under the draft agreement, nor has Python ever billed or invoiced under it. (**Exhibit E**; **Exhibit F**; **Exhibit G**).

26.     At all times, the March 15, 2021 Agreement between the Parties controlled. (**Exhibit A**).  At all times relevant to this action, the Parties acted in accordance with the terms of this Agreement.  Defendants initially demonstrated that they understood this and acted consistently with the indemnity provision of the Agreement.

27.     However, the relationship between Final Expense and Python ended in June 2022 when Final Expense began receiving lawsuits against it, in which claimants sought sums greater than the typical $1,500.00, for alleged violations of the TCPA.  Specifically, Final Expense was sued by three (3) individuals, and, suddenly, Python refused to indemnify Final Expense for the litigation expenses or settlement costs.  For the first time, Python began referencing a draft

agreement, which the Parties were in the process of negotiating, as the terms which controlled the Parties' relationship.  On June 20, 2022—one (1) day before Ms. Levin rushed to sign the draft agreement—Counsel for Python sent correspondence to Final Expense in which it referred to the draft terms that proposed Final Expense be fully liable for all claims.  (**Exhibit P**, correspondence from Weldon Rothman to Final Expense, dated June 20, 2022).  Counsel for Python also attached an invoice that purportedly aligned with the rates outlined in the draft agreement (*Id.*). In fact, the invoice aligned with the discounted rate Ms. Levin personally guaranteed Final Expense more than six (6) months prior. (**Exhibit D**). Moreover, the draft agreement could never have been the basis for the correspondence, because at all times, same was in draft form and never became operational. At all times, the March 15, 2021 Agreement between the Parties controlled.  (**Exhibit A**). In accordance with same, Final Expense was indemnified by Python, and Python bore responsibility for resolving complaints concerning violations of the TCPA.

28.     By failing to indemnify Final Expense, Python has represented to consumers that Final Expense engages in its own outbound dialing and is liable for any violations of the TCPA. This is not so.

29.     Despite Defendants contractual obligation, Python refused to participate or indemnify Final Expense for at least three (3) of the lawsuits.  In these lawsuits, Final Expense incurred substantial attorneys' fees, in excess of $4,200.00, defending the suits and ultimately paid over $100,000.00 to settle the claims.  Ms. Levin stated to Final Expense that the reason she and Python would not participate was because Python could not afford to pay the $100,000.00. As Python continues to refuse to participate or indemnify Final Expense in lawsuits, the harm incurred by Final Expense continues to rise and becomes difficult to estimate.

30.     The facts described above, and the causes of action outlined below, involve

improper actions taken by the Defendants to avoid liability where such was contractually required. Final Expense now brings this suit for breach of contract for failure to indemnify Final Expense and for Python's Deceptive Trade Practices.

## COUNT I – BREACH OF CONTRACT

31.     The preceding Paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

32.     Final Expense entered a valid contract with Python for lead generation services to be provided to Final Expense.  As set forth in Paragraph 13 above, the Agreement provided for indemnity to Final Expense by Python in the event that any claims, costs, actions, losses, expenses, liabilities, and damages arose from Python's outbound calling.  (*See* **Exhibit A**, ¶ 4).

33.     Final Expense, as a party to the agreement with Python, is a proper party to bring this suit.

34.     Final Expense performed its obligations under the Agreement, or alternatively, was excused from performance due to Python's failure to perform.

35.     Python breached the Agreement by failing, without excuse or justification, to indemnify Final Expense for the lawsuits in question, as set forth in the facts section above, and for failing to reimburse Final Expense for attorneys' fees resulting therefrom.  The foregoing is in violation of Paragraph 4 of the Agreement. (*See* **Exhibit A**, ¶ 4).

36.     Python's breach has caused Final Expense's injuries.  That Final Expense has now incurred $104,200.00 in legal fees and settlement fees was a natural, probable, and foreseeable consequence of Python's failure to indemnify Final Expense for the claims of alleged violations of the TCPA against Final Expense and the cases that ensued thereafter.

37.     The actual harm caused to Final Expense by Python's breach is difficult to estimate

due to Python's ongoing refusal to participate or indemnify Final Expense in lawsuits.

38.     WHEREFORE, Final Expense seeks damages in excess of $75,000.00, including reliance damages, restitution damages, actual damages, liquidated damages, attorneys' fees, costs, and expenses, as well as any further relief this Court deems just and proper.

## COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT

39.     The preceding Paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

40.     Alternatively, Final Expense brings this suit against Defendants for breach of implied-in-fact contract.  *ACS Primary Care Physicians Southwest, P.A. v. United Healthcare Insurance Co.*, 479 F.Supp.3d 366, 373-74 (S.D. Tex. 2020).

41.     The terms of the contract are that Defendants are to indemnify Final Expense for claims against Final Expense for violations of the TCPA and fees incurred as a result of same.

42.     The acts and conduct of the parties establish the terms of the contract.  *Plotkin v. Joekel*, 304 S.W.3d 455, 477 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (discussing the requirement of mutual agreement, "which, in the case of an implied contract, is inferred from the circumstances.").  Specifically, Defendants repeatedly represented to Final Expense that they would indemnify Final Expense for suits brought against Final Expense for violations of the TCPA resulting from Defendants' leads.  (*See* **Exhibit A**; **Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**).  Indeed, Defendants mandated that Final Expense not engage with complainants.  (*See, e.g.,* **Exhibit K**: "**It is imperative you let us handle these consumers and that you do not engage with them… We will always take responsibility in protecting you** against these professional scammers, but please work with us and trust our process in getting these problems resolved") (emphasis added).  Following this representation, when TCPA claims arose against Final Expense

resulting from Defendants' leads, it would send the claims to Defendants to handle, which Defendants did, initially. (**Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**). While lawsuits were brought for relatively small sums (approximately $1,500.00), Defendants made repeated assurances to Final Expense that they recognized their obligations under the Agreement and would act in accordance with same. The acts and conduct of the parties established mutual intent to enter such a contract. *Plotkin*, 304 S.W.3d at 477.

43.     Despite the parties' intent to enter a contract and performance on same, Defendants breached the contract. Specifically, once TCPA claims arose against Final Expense resulting from Defendants' leads were asserted for over $1,500.00, Defendants suddenly, and without warning, stopped handling the claims or indemnifying Final Expense, ultimately stating that Python could not afford to pay $100,000.00 in claims. As a result, Final Expense was forced to retain legal counsel to negotiate the claims and pay settlements to the claimants, totaling over $100,000.00.

44.     WHEREFORE, Final Expense seeks damages in excess of $75,000.00, including reliance damages, restitution damages, actual damages, liquidated damages, attorneys' fees, costs, and expenses, as well as any further relief this Court deems just and proper.

## COUNT III – PROMISSORY ESTOPPEL

45.     The preceding Paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

46.     Alternatively, Final Expense brings this suit against Defendants for promissory estoppel. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002); *Collins v. Walker*, 341 S.W.3d 570, 573–74 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

47.     Defendants promised Final Expense they would indemnify Final Expense for suits brought against Final Expense for violations of the TCPA resulting from Defendants' leads. At

all times relevant to this lawsuit, Defendants represented to Final Expense that their leads were compliant with the TCPA and DNC lists. (*See, e.g.*, **Exhibit J**, "we are scrubbing our data against TCPA and DNC litigator list").  In fact, Defendants continue to advertise their services as "DNC scrubbed" and "TCPA scrubbed." (*See* Python Leads, https://pythonleads.com/#pricing).

48.     Final Expense, as a reputable small business, necessarily requires that its leads be legally sourced.  Resultantly, it relied on Defendants' promise by using Defendants' lead generation services for its business.  (**Exhibit A, ¶¶** 3-4).  Final Expense also relied on Defendants' promise by sending any TCPA violation claims brought against it to Defendants to handle and pay. (**Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**; **Exhibit L).**  Because of the nature of the promise, Final Expense's reliance was both reasonable and substantial.

49.     For months, in accordance with the terms of the Agreement, Final Expense relayed complaints to Defendants, and upon Defendants' acknowledgment that they had received complaints and would handle them, Final Expense ceased engaging with complainants.  (*See* **Exhibit A**; **Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**; **Exhibit L).**  From this, Defendants knew, or reasonably should have known, that Final Expense would rely on Defendants' promises.  Final Expense did, in fact, rely on Defendants' promises by continuing to operate under the Agreement and engage Defendants for lead generation services, and sending all TCPA claims to Defendants for resolution.  (**Exhibit A**; **Exhibit E**; **Exhibit F**; **Exhibit G**).

50.     Final Expense ultimately relied on Defendants' promises to its own detriment.  In June 2022, Defendants abruptly reneged on their promises to handle all complaints concerning violations of the TCPA and indemnify Final Expense for related litigation expenses and settlement costs.  Without notice, Defendants suddenly refused to uphold their obligations under the Agreement (**Exhibit A**).  Instead, Defendants began referencing the draft agreement, which was

neither finalized nor executed by both Parties, as the controlling terms of their relationship.  (*See* **Exhibit N**).  In reality, Defendants were feebly searching for any opportunity to avoid liability for the responsibilities to which it agreed.  (*See* **Exhibit A**, ¶ 4, "It is the sole responsibility of [Ms. Levin and Python] to familiarize with all laws and regulations applicable with TCPA, FEDERAL AND STATE DO NOT CALL REGISTRY!... "[Ms. Levin and Python] will hold [Final Expense] harmless from and against any and all claims, costs, actions, losses, expenses, liabilities, and damages ("Claims") arising from the Undersigned's breach of the Agreement or this Addendum or failure to ensure that the Leads provided to your company comply with the terms of the TCPA") (emphasis in original).  As a direct result of Defendants' sudden conduct,  Final Expense was forced to retain legal counsel to negotiate the claims and pay settlements to the claimants, totaling over $100,000.00.  Based on Defendants' prior handling of TCPA claims against Final Expense and based on conversations between Final Expense and Defendants, Defendants knew or reasonably should have known that Final Expense was relying on Defendants' promises to handle additional claims.  (**Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**; **Exhibit L).**

51.     Injustice to Final Expense can only be avoided if Defendants' promises are enforced.  Because Final Expense reasonably relied on Defendants' promises, Final Expense had no reason to expect, and indeed did not expect, to incur over $100,000.00 in damages with respect to TCPA claims coming from leads generated by Defendants; injustice can only be avoided by enforcing Defendants' promises of indemnity.

52.     WHEREFORE, Final Expense seeks damages in excess of $75,000.00, including reliance damages, restitution damages, actual damages, liquidated damages, attorneys' fees, costs, and expenses, as well as any further relief this Court deems just and proper.

53.     Final Expense is entitled to recover reasonable and necessary attorneys' fees under

Texas Civil Practice & Remedies Code § 38.001(8) because this suit is for promissory estoppel. Final Expense retained counsel, who presented its claim to Defendants. Final Expense did not tender the amount that was owed within thirty (30) days after the claim was presented.

## COUNT IV – QUANTUM MERUIT

54.     The preceding Paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

55.      At all times, the relationship between the Parties was controlled by the Agreement in which Python was obligated to indemnify Final Expense for all claims. (**Exhibit A**). In the alternative, without waiving any of the foregoing, Final Expense pleads that Python accepted payment without providing valuable services.

56.     Final Expense paid for live transfer services. (**Exhibit E**; **Exhibit F**; **Exhibit G**).

57.     Python accepted payment for live transfer services. Python knew Final Expense does not engage in any outbound dialing, so it—Python—is responsible for any claims concerning violations of the TCPA. Without this guarantee, any leads transferred from Python to Final Expense are, at best, without value, and at worst, a liability.

58.     Python knew or should have known Final Expense expected to be indemnified from all claims. The expectation is set forth in the Agreement the Parties had previously entered into and is standard in the industry. (*See* **Exhibit A**).

59.     Python had reasonable notice that Final Expense expected indemnity for its live transfer leads, as indicated by its Agreement and Python's own conduct. (**Exhibit A**; **Exhibit D**; **Exhibit H**; **Exhibit I**; **Exhibit J**).

60.     Because Final Expense expected compensation, Python's refusal to provide indemnity has resulted in the following damages to date: $104,200.00. Damages continue to

increase as Python continues to refuse to indemnify Final Expense from litigation.

61.     Final Expense seeks damages within the jurisdictional limit of the Court.

**COUNT V – VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT**

62.     The preceding Paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

63.     Final Expense brings this cause of action against Python under Tex. Bus. & Comm. Code §§ 14.41–.63, the Deceptive Trade Practices Act ("DTPA").

64.     Final Expense is a consumer with standing to bring this suit under the DTPA, as a business entity that acquired services by purchase.  Tex. Bus. & Comm. Code § 17.45(4), (10).  Namely, Final Expense contracted with Defendants to provide lead generation services.  Tex. Bus. & Comm. Code § 17.45(2) (definition of services); *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983) (plaintiff establishes its standing as a consumer in terms of his relationship to a transaction).  Moreover, Texas law regards the sole proprietor and the sole proprietorship as one and the same person.  *CA Partners v. Spears*, 274 S.W.3d 51, 62 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

65.     Defendants can be sued under the DTPA as persons who used or employed false, misleading, or deceptive trade practices.  Tex. Bus. & Comm. Code § 17.50(a)(1); Tex. Bus. & Comm. Code § 17.45(3) (defining "person" to include individuals, and entities, however organized).

66.     Defendants engaged in conduct prohibited by the DTPA.  Specifically, Defendants caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of services; caused confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; used deceptive representations or designations of geographic origin in

connection with services; represented that services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have; disparaged the services of another by false or misleading representation; represented that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and represented that a guaranty or warranty confers or involves rights or remedies which it does not have or involve.  Tex. Bus. & Comm. Code § 17.46(b) (establishing the "laundry list" of specific acts considered false, misleading, or deceptive under the DTPA); *see also Pennington v. Singleton*, 606 S.W.2d 682, 688 (Tex. 1980) (holding that courts interpret the "laundry list" broadly because the Legislature did not intent the DTPA's purpose to be circumvented by loopholes).

67.     Final Expense relied on Defendants' false, misleading, or deceptive trade practices to its own detriment.  Tex. Bus. & Comm. Code § 17.50(a)(1)(B).  Final Expense has incurred $104,200.00 in legal and settlement fees as a direct consequence of Python's representation that it would indemnify Final Expense from all claims arising from Python's breach; these legal and settlement fees are distinct from those incurred in this lawsuit.  (**Exhibit A**, ¶ 4).

68.     Additionally, Defendants breached an express warranty, arising from the negotiated aspects of the valid contract that the Parties executed and operated under. Tex. Bus. & Comm. Code § 17.50(a)(2); **Exhibit A**.  Express warranties are applicable when, as here, a professional entity sells a professional service and promises a specific outcome.  *Sorokolit v. Rhodes*, 889 S.W.2d, 242–43 (Tex. 1994).  Here, Python is a seller because it entered into a contract with Final Express, in which it would provide lead generation services to Final Express.  Tex. Bus. & Comm. Code § 2.103(a)(4); **Exhibit A**.  Final Expense paid for Python's services as invoiced under the terms of the Agreement.  Tex. Bus. & Comm. Code § 2.103(a)(1); **Exhibit E**; **Exhibit F**; **Exhibit G**.  At all times, Python was bound by the terms of the Agreement because it warranted that it

would indemnify Final Expense from all claims arising from Python's breach.  (**Exhibit A**, ¶ 4).
Defendants breached their warranty by refusing to indemnify Final Expense in litigation that arose
in June 2022.

69.     Defendants committed an unconscionable action or course of action.  Tex. Bus. &
Comm. Code § 17.50(a)(3).  To Final Expense's detriment, Defendants took advantage of its
capacity to a grossly unfair degree.  Tex. Bus. & Comm. Code § 17.45(5).  Defendants were aware
of the claims complainants launched against Final Expense, and, in accordance with the terms of
the Agreement, insisted Python was the appropriate party to handle all claims.  (**Exhibit A, ¶ 4**;
**Exhibit H**; **Exhibit I**; **Exhibit J**; **Exhibit K**; **Exhibit L**).  Without any notice or reason, Python
withdrew from its obligations and began refusing to indemnify Final Expense in June 2022,
representing a glaringly noticeable, flagrant, complete, and unmitigated unfairness. *See Bradford*
*v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001).

70.     Defendants' actions were a producing cause of Final Expense's damages.  To date,
Final Expense has incurred $104,200.00 in legal and settlement fees (distinct from those incurred
in this lawsuit), though the actual harm caused to Final Expense by Python's breach is difficult to
estimate due to Python's ongoing refusal to participate or indemnify Final Expense in lawsuits.

71.     WHEREFORE, Final Expense seeks damages in excess of $75,000.00, including
actual damages, liquidated damages, prejudgment and post judgment interest, attorneys' fees,
costs, and expenses, as well as any further relief this Court deems just and proper.

## **CONDITIONS PRECEDENT**

72.     All conditions precedent to filing suit have been satisfied.[5]

---

[5]      Plaintiff served its notice of DTPA claim on Defendants on August 11, 2022.  As this Complaint was filed
within the sixty (60)-day response period, which expires on October 10, 2022, Plaintiff moves the Court to stay
proceedings in this case until October 10, 2022.  Additionally, Plaintiff served its notice of its claim for promissory

### PRAYER

73.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that this Court issue a citation for Defendants to appear and answer, and that Plaintiff be awarded a judgment against Defendants for the following:

a. Actual damages;

b. Liquidated damages;

c. All costs and attorneys' fees incurred in prosecuting these claims;

d. Pre- and post-judgment interest;

e. General damages;

f. Special damages;

g. Nominal damages;

h. Costs of court; and

i. Such further relief, both general and special, at law or equity, to which Plaintiff may show itself to be justly entitled.

---

estoppel on September 1, 2022.  This Complaint was filed within the thirty (30)-day response period, which expires on October 1, 2022.

Respectfully submitted,

**NEEL, HOOPER & BANES, P.C.**
Bryant S. Banes
Texas State Bar No.  24035950
Federal ID No.  31149
Sarah P. Harris
Texas State Bar No.  24113667
Federal ID No.  3421904
1800 West Loop South, Suite 1750
Houston, Texas  77027
Tel:  (713) 629-1800
Fax:  (713) 629-1812
E-mail:  bbanes@nhblaw.com
            sharris@nhblaw.com

**ATTORNEYS FOR PLAINTIFF,**
**FINAL EXPENSE DIRECT**